May it please the Court, I'm Joel Davidoff from the Cuneo Gilbert firm in Washington, and I represent the SawStop Companies. There were two appellants here. One SawStop Company holds all the patents on saw safety and power saw safety, which were granted to our president and founder, Dr. Steven Gass, who, as we showed, is a PhD physicist and recipient of innumerable Inventor Awards from Woodman Associations and Inventor of the Year Awards. The second company, SawStop, was created four years later when he went around Oregon and raised money because since nobody in the saw industry would take his technology to make the saw safer or change the standard to make saws safer, he said he'd go and make safe saws himself. And having suffered this rebuff, he wondered how to explain it or the source of his frustration, and that eventually became clear. One of the things he did to try to help people who lost fingers due to the conventional saw that didn't have a preventive device on it was to testify in court that there was a better solution and therefore it was negligence to not have the safer technology. During one of those cases Osario mentioned passing, the jury found that Ryobi was negligent to not have the SawStop stuff and awarded over a million dollars. But when one of the witnesses, Mr. Piat, who was a Ryobi engineer, was questioned, he said there had actually been a meeting of the major saw manufacturers and that at that meeting they had discussed the desirability of what could be called an all or none. That is, it would be better that for product liability that either they should all reject it or they should all accept it. Well, your whole case hinges on whether the pleadings are sufficient to establish a Section 1 claim under Sherman Act. Three Section 1 claims, Your Honor. There are two for what I'd call the North Carolina Dennis question or the Radiant Burners question and then there's one under what I would call the Robertson question. How do you meet those elements? How do we meet the elements? Yes, in terms of your allegations. Well, both Robertson and Third Circuit case West Penn say that if some participant acknowledges an agreement to act jointly in boycott terms, that that is the first element. The second element is that at least some people did boycott. Let me ask you so we're clear which of the laundry list of defendants here are covered in the pleadings and which aren't. As I read it, there are approximately four foreign parent corporations, Tektronik Industries, Makita Corporation, Hitachi, Koki Company Limited, and Robert Bosch, GMBH. What basis for their liability is pled other than that they're the parent corporations of other entities? Well, some of them, Bosch, for instance, had an official who part of the time was with a German company, part of the time was American, and some of the companies were joined in the various joint ventures, which we considered a sham, and some of them were the ones who made the unsafe saws after they bought off the safe saws. So you're saying some of these foreign parent corporations were what? They weren't participants in the Power Tool Institute, I don't believe. Well, I believe our brief went into that, and obviously the gravamen of our case is the case against the major sawmakers. And if the judge on remand, there are separate motions to dismiss a few foreign parents. The judge can rule on those if he chooses to lop off a foreign parent. So what is the, you know, under the Twombly-Iqbal standard, what is the evidence of the group conspiracy to boycott? Because the fact that the companies attended a trade association meeting or representative of the companies attend a trade association meeting, that's not an antitrust violation. It's a standard feature of professional life and business life. And the heads of companies, just as we lawyers do, we meet in conventions and discuss issues of interest to the business or the profession. And what, where is the Sherman Act violation in that? That's what I'm trying to find out. All right. First of all, I believe that the full record would show that this is what we in the antitrust profession call a rump session. That is, it was not the regular meeting. It was a meeting not of all power tool people, but only of the six saw people who didn't want this technology. Give us, what's the context? You're talking about a meeting. What meeting are you talking about? Well, there's a power tool institute which is in the city and has all kinds of meetings. And most of those meetings are scheduled in advance, have an agenda, have a lawyer present. There's no suggestion there was a lawyer present at this meeting, but there would have been if it had been a regular meeting. So my conclusion is that it was a rump session. But we're just starting discovery on that point. All we have is what the witness said in another trial. But given that the behavior afterwards was totally consistent or largely consistent with their absolute desire to fend off this technology no matter what, they continued for 10 years jointly to fight it. Let me ask you, how is the behavior consistent with a Sherman 1, a Section 1 violation? I mean, there were licensing negotiations. As far as I can see, after the meeting, there seemed to be evidence of non-parallel behavior because you entered separate licensing negotiations with the different power saw companies. And the licensing negotiations, as far as I could tell, appeared to take a different course. There were different royalties offered, different durations. And if there was a boycott, didn't one of the companies offer you a 1% royalty on their sales in return for the license to use your technology? And as I understand it, you turned it down. No. Because you're quoting the judge's misquote, we're entitled to what we pleaded. We pleaded in paragraph 87 that we accepted it in principle, asked for two small changes and a re-signing, that their representatives said the changes were fine and we'd get that right back. We never got the second version. And when we asked the person why... Well, maybe so, but that doesn't go to the fact that there were separate licensing negotiations with the different power saw companies, which, as I understand it, were proceeding on different tracks. Well, this technology was so attractive that there were people in the industry who wanted to do it. But this case, in my mind, is very much like the Foley case. There are four negotiations we can look at, three of which the judge's findings were simply not what we pleaded. We pleaded a much better case than what he said we pleaded, and we have the record. The first company is Buck. Well, that's the focus I've been trying to see if you go to, and that is under the Sherman Section 1, you've got a couple of elements. First, you've got to say whether there's a contract or a conspiracy, and then whether there's an unreasonable restraint. And we look essentially to the allegations in this instance, not the evidence, the allegations that you make in a 12B6 context to determine if it is sufficient to meet the elements that are listed there. So I think that's kind of the better way to do this is to actually look at your complaint and show how it is that it meets those elements. But, you know, as opposed to the general just discussion of evidence, if you point to the complaint. Well, we're talking about paragraphs 87 of the complaint and 89. There were four things that happened, and in my mind they were almost identical to Foley, and that is Bosch tells us no and then convenes a rump session at which it says somewhat like Jack Foley did in Foley, I'm out here, I want you guys to break off your negotiations because I don't want to be embarrassed in a product liability case by you guys doing this. Emerson then breaks off the negotiation without explanation. The judge doesn't even mention. They got out of the saw business. Well, a couple of years later, not then, and that was not the reason at the time. Well, didn't somebody offer you 1%? Well, and let me go into what was said and what wasn't said. The judge, we were entitled to have what we pleaded discussed. We said that the person who offered 1%, first of all, it was far below, we could show that it was not a commercial rate that anybody would accept. But secondly, they threw in a booby trap. They said we had to indemnify them for anybody who lost a finger. But at the end of the day, under Twombly-Iqbal, you've got to go beyond speculation and beyond possibility to plausibility. Yes, well, the – And I get to get back to Judge Wynn's question in the complaint. Yes. You know, there were a lot of different things you could have said, which was, you know, in the amended complaint, there were no minutes to the meeting and there were no e-mails mentioned in the amended complaint. And you say, oh, well, that's all discovery, that's all discovery. But the point is there has to be something in the amended complaint that suggests plausibility. Excuse me, counsel. And there seemed to be some holes here that at some point need to be addressed because the fiat testimony on which you place weight refers to a joint venture in 2003, but that's years after the alleged boycott, which was supposed to take place in 2001. And the other problem I have with this conspiracy is why did the – after the so-called boycott and conspiracy, why did all these different negotiations with different companies in different terms? You weren't negotiating with an industry group or some contract that one company was going to ship around as a model for others. The companies who are defendants in the complaint seem to be acting independently as far as I can tell. In Foley, one of the people acted differently than the confessed conspiracy, and there was a phone call. We believe that in the major example, which is Ryobi, their refusal to explain why they broke off the negotiations is indicative that they didn't want to tell us why and that discovery would show that the people who had been in the original meeting had called them up and saying, back off. Isn't that rather speculative? Because it's just as plausible. You've got to show that yours is the more likely scenario, but it's just as likely in these negotiations that the company brought up decided to break off negotiations because, number one, they may not have been convinced of the superiority of your technology, or maybe, two, you were asking too much in terms of a percentage royalty and more that they wanted to pay for the license. But the statement was that they were going to pay it, and then they broke off. In my mind, when someone won't explain to you why they've done something, that is very strong evidence that something was wrong. They would not tell us why they broke off. If they were so anxious to do this, why would they have even entered into negotiations in the first place? Was that all part of a ruse? Because Fiat was in love with our wonderful testimony until the conspiracy told his bosses to back off because that was the deal. So if this conspiracy started in 2001 or 2002, and you've got all these other negotiations that continue, is the implication we're to draw from your pleading that all of these entities went about an elaborate ruse to engage in these negotiations on different terms in order to cover the boycott conspiracy? There were only two, not so many. Nobody made an offer except for Ryobi, which backed down mysteriously, and the 1% offer where we said it was a booby trap. This is a case where we also argue fraudulent concealment. These were sophisticated companies, and they were in the middle of negotiation, and they had to break off in various ways to respond to what Fiat said was Bosch's point. Moreover, we're not getting there. We had two other counts, which is this is a 10-year period in which 60,000 people lost their fingers, in which this industry fought uniformly that this technology never go forward. Fiat didn't just say something about a joint venture. He said it was an all-or-nothing deal, that everybody said we cannot have a position where some of us license and some of us don't. And over 10 years, none of them took a license, none of them made it, and none of them would allow a standard. And it's terribly injurious to us and to the American public, and that's why the AMICI, the Consumer Federation of America is here, the American... Thank you. Thank you, Your Honor. May it please the Court. The District Court recognized that this is a highly unusual antitrust claim. Plaintiffs invented a new technology that had never been implemented successfully in a commercial product. When they were unsuccessful in convincing industry participants to pay the terms that they were demanding for a license, they went to the underwriters' labs and tried to use the standard-setting process to mandate that technology on the whole industry. When that didn't work, they tried to do the same thing through the CPSC, and now they're trying to use the antitrust laws to constrain competition in this market. Now, of course, there are a lot of individual defendants in the case and a lot of individual issues. We are happy to talk about them, but we don't think that the Court needs to reach any of those issues because the District Court correctly recognized that this amended complaint doesn't state a plausible antitrust claim against anyone. If I may, I'd like to start with the... Is that because it doesn't meet either of the elements, are not satisfied, it's not a conspiracy alleged here sufficiently in the complaint, or that the unreasonable restraint is not sufficiently alleged? It's both, Your Honor, and on all three of the conspiracies, although maybe there are different... A different path is the easiest path on each of the three counts. Starting, if I may, with... But even within the complaint, when they use language that... Alleged that you agreed and did conspire to do certain things, if we take that on a light... Proof of light, as we mentioned on 12b-6, even on the Iqbal, the Twombly statement, we must accept that. Well, Your Honor, the core holding of Twombly is that it concludes the reallegation of conspiracy or agreement. It's a legal conclusion, not a real statement of fact showing entitlement to relief. And so Twombly says, straight out, you disregard allegations in the complaint that just say the defendants agreed. They have to plead facts that show why a... When they say conspired to boycott the South... Or conspired to do specific things, I mean, where do we go with this in terms of saying the allegations are insufficient? Because we are at the pleading stage. And at that point in time, determining what's plausible and what's not plausible means maybe this should go to the next stage rather than saying, well, this is just some conclusion that you're throwing out here. But yet those conclusions are supported to some extent by saying, well, you did have this PTI meeting and you did have this particular testimony here in which there are statements here to... Your Honor, what Twombly says is you disregard the naked allegation of conspiracy and you look at the specific facts that are pled. And here they have two paths that they try to make this conspiracy allegation plausible. The first is the circumstantial evidence of the negotiating history. But they have repeatedly conceded themselves in this case that the negotiating history they have alleged is just as consistent with independent conduct as it is with any inference of conspiracy. They conceded that on pages 7 and 27 of their... How do you determine what the independent conduct is? Is that something you just... You have to have emails and everything else to know that? It's the negotiating history, Your Honor. They allege it. Where does that come from if you have just the allegations here and the allegations set forth these things that to me are fairly specific facts that mean to go one way or the other and we're at a pleading stage of it and we're talking about things that's dealing with the so-called active injury mitigation technology that... Well, Your Honor, the... I mean, as we're dealing with these issues here and they're specifically alleged, you had a little meeting there and you got together and this happened even during the... during the products liability action and they're getting together and they're boycotting certain technologies here. They're making arrangements and then we haven't even gotten to the business to understand this situation and saying that you're influencing or setting standards or preventing the standards from being incorporated into it. Well, Your Honor, can I address that? These are allegations at this point but the allegations are based on specific things here. But, Your Honor, what they're based on is the testimony of a senior Ryobi engineer, David Piott, in this product liability trial, the Osorio trial, and as the district court correctly recognized, David Piott's testimony in that trial is not within a million miles of being direct evidence of a conspiracy. It doesn't even provide inferential support for a conspiracy. What David Piott was testifying about was a... Direct evidence of a conspiracy in order to be able to make an allegation sufficient to support... You either have to have parallel conduct plus evidence which puts that parallel conduct in a context suggestive of agreement, which they do not have, or you have to have some form of direct evidence and they have neither. What the district court correctly recognized is if you... What may be the plus factor of circumstantial evidence joined with the other allegations? Well, Your Honor, I mean, first of all, when you start talking in those terms, you're presuming that they are... That they've alleged parallel conduct and they're at that line where all they need is something to tip them over. The district court correctly recognized that they haven't even alleged parallel conduct here. The negotiating history that they have alleged is... It goes beyond neutral. It's, if anything, suggestive of non-conspiratorial action because all of the defendants did different things. They alleged that there was a meeting on October 5th of 2001 at which everyone joined an all-or-nothing conspiracy and then they allege what people actually did and it's completely inconsistent with that suggestion. Black & Decker, six months later, offered them a 1% royalty deal, which they rejected on the merits. Ryobi, months later, offered them a deal that would have escalated to 8%. Emerson continued negotiating for months. These are the allegations of their complaint. So they're not anywhere close to the parallel conduct line here. And then with David Piott's testimony, the district court recognized that he was entitled to read the entirety of the testimony. This is not this case. If the order were reversed, you had the negotiating history and then you had the Power Tool Institute meeting after the negotiations had ended. Would that have been sufficient? I don't think so, Your Honor, because you would still have a negotiating history that they concede is not suggestive of conspiracy. They've conceded it repeatedly. And then David Piott's testimony, and Piott's testimony is describing, if you read the whole thing in context, he is describing a lawful joint venture between the defendants that the Power Tool Institute discussed and ultimately formed. Plaintiffs do not challenge that joint venture in this case. They say very clearly on page 27 of their reply brief that they are not contending that that joint venture among the Power Tool Institute to develop alternative safety technologies is any kind of antitrust violation. And I urge you to read the entirety of David Piott's testimony. That is all he is talking about. He gives a long description of the Power Tool Institute discussions about whether to form that joint venture and about what its objectives are. He says very clearly that no one was going to be required to join that joint venture if they formed it. He says very clearly that that joint venture's objectives would not be limited in any way, that it could study any form of table saw technology, including AIMT, if it wanted. And the district court looked at that and realized that he... Part of it is that the joint... Piott's testimony is just paraphrased. It's not... It isn't really quoted in the brief. And, again, the conspiracy was supposedly formed in 2001, I guess, and the joint venture didn't get going until 2003. And the joint venture itself was... ...designed as a venture to determine what is the best safety technology in this industry. Absolutely. And that is one of the things you would like joint ventures to do. You want different companies to say, this is... I think this is a safety technology that will work best. If you cut off those kinds of discussions, that's not promoting safety in any way, shape, or form. And so this joint venture isn't part of the conspiracy. It's not alleged to be. It is lawful and pro-competitive. And, indeed, Your Honor, there's nothing wrong with participants in an industry like this researching alternatives to a new technology like saw stuff. And there's nothing... The overall point is that the plaintiff is the one who is seeking an anti-competitive situation and an anti-competitive advantage, and he's trying to get the courts to say that this safety technology must be adopted or whatever, and he's trying to secure a place in the market from courts that the product by itself hasn't earned. That's absolutely right, Your Honor. Maybe it could earn it, but that's a marketplace development. The thing that troubled me about this case is that the plaintiff is complaining about monopolization, and yet at various junctures in the road, he's claiming a form of monopolization for his own product, and when the negotiations between the companies didn't fall through for many different reasons, because they didn't offer him what he wanted or because they weren't sold on the safety technology, and then he wants, essentially, the U-Lab committee to sort of dictate his technology as an industry-wide standard. And that is anti-competitive, and it doesn't seem to me that what you have here, which is pretty thin gruel, is going to move the needle from possibility to plausibility, and those Supreme Court decisions, they matter in terms of how we read complaints, and I agree totally that we can accept that. We accept the allegations as true. There's no question about that. But even if you do, and as we must, do they come to the level of plausibility, or are they simply indicating someone who wants to introduce anti-competitive effects in the market, who wants to say that trade associations meeting are somehow illicit, and who wants to point to non-parallel negotiations, very different, as evidence of a conspiracy, and wants to point to joint ventures on questions of safety, which is industry behavior which ought to be encouraged, and if all of this is going to be an antitrust violation, then we're off on some very unusual road. Your Honor, I think the antitrust law is recognized in a lot of contexts, that there is a big danger that they could become their own worst enemy. So what we have here, though, that sounds like a very fair statement of a situation that might be appropriate in my mind for a Rule 56 type determination with that kind of evidence, but what we are looking here purely is a determination of whether the elements of a Sherman One Act is established by these complaints. And you say there's no parallel plus, but then you do have this national coordinating council at the Defense Research Institute. He's standing up there basically telling you that, hey, this is a way to avoid products liability to do this very thing. You don't want to enact this kind of safety technology. And by the way, all of the efforts that you claim that the companies have been making to try to implement this active injury mitigation technology, to my understanding, never has happened. No effort whatsoever, nothing. In fact, the negotiations that were supposed to have happened have been a complete sham, at least from the allegations that made here, because those negotiations weren't made in good faith. You make a 1% offer, and if that is so, it incentivizes companies to make lowball offers in an effort not to settle at all. The incentive here, at least from the perspective of Sherman One, is to look first, is there a contract being alleged here? And the various allegations here set that forth, at least in terms of looking at them from a truthful perspective. You can get into the semantics of whether it is plausible or not, or possible, but that can be done in every case. And if you have a situation where you've got giant sawmakers out here and 60,000 injuries are alleged to be occurring per year, and you've got a PhD person who's created some safety mechanism that he says works, he tries to implement it, the incentive from a product's liability, as said by the DRI counsel, and I don't know if that was you or whomever that did it here, is, look, we don't want to do this, because if we do this, we may take on some form of product's liability in this perspective. Your Honor, this Court's cases are very clear that a mere exchange of information at a trade association meeting,  Well, it's not just a mere exchange of information when you already have these other facts in conjunction with it. There are no other facts. There is a non-parallel negotiating history, and they have somebody at a trial describing a joint venture that they concede is lawful, and it has borne fruit, Your Honor. That venture filed a patent in 2009. The Venture Research Institute National Coordinating Council gives a presentation just on this whole situation. So there's an allegation that somebody at a trade association meeting made the point that if somebody adopts this technology, that that could shift the product's liability universally. That's it. It's an allegation that fits within all of these people who are attending it. It fits within nothing else, Your Honor. This Court and many other courts have recognized that trade associations are not walking conspiracies just because they discuss issues that are of interest to the industry. You have to have evidence supporting an inference of a later agreement. Which product liability might be what? Right. I mean, it would be unusual if a trade association didn't discuss something about product's liability. It would, and by the way, Your Honor, when SawStop actually entered this market two years later, they put a saw on the market that used their technology, and none of the defendants felt that they needed as a product's liability matter to rush to adopt this technology. Again, that's appropriate for Rule 56 type determinational summary judgment. But in an instance of what we're dealing with here, these allegations here that are before, essentially when you stand back and see what's going on here, you've got to say there's some evidence here that's being presented, at least from the allegations in looking at it. I'm not saying they're going to win or lose, but Twombly and Iqbal did not get rid of allegations and the opportunity to liberally plead cases. They have to plead facts. In which this very thing can happen. They have to plead facts that raise a suggestion of agreement, and they have not. All they have pled is a negotiating history that they concede is just as consistent with perfectly independent content. Negotiating history wasn't intended to go anywhere from their perspective. It was a sham. It was set up to basically just play it along and let it go, and we will continue going our way from the standards perspective because of the influence and, of course, it's not a public body generally is not a part of a Sherman Act, but when they do standards and you've got a problem with a private type situation, then you've got a problem. Your Honor, with respect, I believe what you were describing is the pleading standard of Connolly versus Gibson. That you look at the complaint and you see, will it be possible for the plaintiffs to prove any set of facts consistent with these allegations under which they would be entitled to relief? That was the pleading standard for a long time, and in Connolly, the Supreme Court said. I'm not going back there. I'm going strictly on what this complaint is, and I think you don't go outside if you look at this complaint and you lay it down on a table just as you do in a real estate transaction to see if a survey is meeting the land, and you determine that those allegations are meeting that element over here, and you can speculate all day long that there are e-mails and other stuff that can go on, but I don't think that changed the standard that that's evidence, and if you need to bring in evidence, then we switch from 12B6 over to 56. Nobody's trying to bring in evidence of anything, Your Honor. We are looking at the complaint and looking at what it alleges, and it alleges no facts that raise any suggestion of a conspiracy here. All of the facts that they have pled are perfectly consistent with lawful independent conduct by all of the defendants. They conceded the point as to the negotiating history, and all they have other than that is David Piott's testimony, and if you read it, you'll see that he's talking about a joint venture that they have disclaimed any challenge to on page 27 of their reply. That's the basic point of those two Supreme Court cases, Twombly and Eckford, where facts are pleaded that are perfectly consistent with lawful behavior. It doesn't clear a plausibility bar. That's why those two decisions were handed down. You may not like the decisions, but that's why they were, where you plead facts that are perfectly consistent with lawful conduct. That doesn't jump from possibility to plausibility. That's why those decisions were handed down. Yes, Your Honor, and then when you get to the two counts that are about standard setting, you have the additional problem that, as Your Honor pointed out, they are alleging that Underwriters Labs refused to restrict competition in this market. The standard setting cases that succeed are cases where competitors get together and write a standard that excludes someone from the market, but the Underwriters Labs decision that they challenged left everyone, including them, free to do whatever they want, free to sell their saws, free to license their technology. They were trying to get Underwriters Labs to adopt a standard that would have excluded everyone from the market except for them. Now, they say that a reduction in quality competition is a harm to competition, and we agree, but it takes remarkable chutzpah for them to say it because they're the ones who were trying to restrict quality competition in this market. It is not an improvement in quality competition or pro-competitive to take options off of the market that consumers want because you have a different view of what consumers ought to want than the market does. The consumers are entitled to believe that a quality saw in this context is a saw that is light enough, portable enough to carry to your job site. And for 10 years until actually this year, nobody's ever figured out how to put AIMT into a portable saw. Actually, Your Honor asked earlier about what has happened with the joint venture. Bosch is coming out with an AIMT saw design of its own later this year, and SawStop has finally come up with a portable saw. But it took them 10 years to figure out how to make a saw that would satisfy the vast majority of the market. If Underwriters Labs had done what they wanted them to do, then the only kind of table saw that anybody would have the opportunity to buy would be a big cabinet saw that satisfies a very, very small portion of the demand for table saws. So it's not pro-competitive to restrict consumer choice, and the allegations of conspiracy in this case, as to all of the counts, are purely conclusory. They have an allegation of an agreement, but the actual facts that they plead are perfectly consistent with every one of the defendants operating in their own independent business interests. And I haven't heard anything to the contrary today. Go ahead. Further questions? I would point out first, going back to Iqbal and Tongvi, that I put it to you that there has not been a single case but this one in which a meeting to discuss concerted action was pleaded and admitted by one participant and a dismissal was made. Parallel under Twombly was accepted. Twombly dealt with the fact that he couldn't plead a meeting. He just had parallel counting. So they said, well, show us where discovery would show us more. And in this case, the man, Piat, said that he wrote to his colleagues about exactly what was agreed. Now, you're differing with what was agreed. We say what was agreed, and they use the word is how to deal with saw stop. Are you attacking the joint venture? I'm attacking the – I don't have to, but let's put it another way. This is a Jones knitting case, which says Thursday, it's a per se violation of people faced with a license who are trying to not take the license. And here they say, rather than licensing from saw stop, let's see if we can do something else. Well, in that case, the purpose of the joint venture is to fulfill their basic policy, which is don't take a license from saw stop. So it becomes part of a two-part scheme, which is what should we do? Take a license from saw stop? Nah, I don't want to pay royalties. We'll just have a joint venture. That's your nefarious gloss on it, but I'm not sure that your complaint alleges anything else, alleges anything to back this stuff up. Well, the complaint, we're talking about the quotes from sworn testimony in a case. That's what Robertson said was enough. That's what West – No, but I'm not – I'm talking about the non-parallel behavior and the non-parallel negotiating positions, and the fact you say, well, I'm still concerned about this contract that you rejected, which would have resulted in a licensing of your own product. Well, he – we didn't reject it. We simply said we accepted, could you catch a few typos? And then he never came back. He told us it was fine. We accepted. We pleaded we accepted. The judge misstated what paragraph 87 says. We're entitled to what we did say, which is we accepted it in essence and asked for a few changes, having been assured that those were acceptable. How would they go through all the trouble of negotiating? I mean, why would these different companies go through all these different negotiations? You know, if there was some preconceived – they would just say, look, don't talk to SawStop. But instead what happens is there's a set of detailed negotiations that the various companies, to various degrees, undertake. First of all, these are all factual questions which Discovery would normally deal with. It's always the claim that Discovery will do this and Discovery will do that. But the difference is – Sir, excuse me a minute. What I'm saying is the point of Twombly and Iqbal is that the jump from 12B6 to Discovery is a hugely significant jump that consumes vast amounts of resources and huge amounts of time. You're talking about two or three years. Yes, and the point of Twombly and Iqbal is if you can't show a meeting beforehand, then you probably shouldn't do it. But there was a meeting, and I'm afraid that your suggestion that PI didn't talk about SawStop – you said he just talked about the joint venture. Quoting page 9 of our brief, defendants, he said, quote, got together and decided they would work collectively so they would all put SawStop technology in the market if they wanted to and decided it was in their interest to do so. The question says in three different quotes, the meeting was about how to deal with SawStop. And the two main ways were somehow or other break off the negotiations. Every negotiation was broken off. There was parallel. By the end of the year, every single possible licensee had broken off the negotiations with the exception of the one who made an unacceptable bid, which is a trial question. And they never took a license later, and they fought it. This theory that we're anti-competitive in Radiant Burners, which is a key Supreme Court case, the inventor fought to have his technology become the patent. He was a hero of the public interest. We had the safer technology. UL is supposed to pick the safest technology. The Supreme Court has said that if you pack that thing. You're acting as though, you're speaking as though the SawStop technology is the answer to all the industry's problems. I don't know that to be the case. Well, we'll show it at trial. No, I don't. A lot of it could be that they are simply unconvinced of the fact of what SawStop represents. I don't know that it's necessarily this great a gain in safety as opposed to some other safety technique or whether the SawStop technology makes the product unmarketable. In other words, I'm saying that there are many, many lawful explanations for this conduct, and that's what Twombly and Iqbal seek to protect. And a lot of it may have to do with skepticism about the SawStop product itself and whether it's a best answer to the industry's challenges and whether it's going to turn off consumers or whether it's going to do the job or how much expense it's going to add to the product. But there are many, many different explanations for meetings and for refusals to adopt the technology. And if we try to place a nefarious sheen on all of this different conduct, it's going to get to the point where if you don't adopt somebody's technology or if you meet in a trade association meeting, then you're running afoul of the law. The implications of that are serious for industry and they're serious for consumers. And in addition to being against the grain of what Twombly and Iqbal sought to represent, sought to hold. Well, the facts are precisely opposite of what you just said. No, they're not. Let me finish, please. There are 60,000 uses of SawStop with no injuries and there are 8,000 amputations a year with the defendant's technology. This is unprecedented for the Consumer Federation of America to come in here as to how important this case is. There are those injuries. You have a perfect right to bring a products liability action and that can be very damaging on the industry. But to try to shoehorn it into an antitrust violation is something different. Well, radiant burners and the hydro level case, it's been shoehorned. It is standard Supreme Court law that it is nefarious for people to dominate an industry and vote their own interest instead of the safety quality. And if that's a fact of the issue, we will show at trial that no objective person would have voted against our standard.  Thank you, sir.
judges: J. Ha rvie Wilkinson III, G. Steven Agee, James A. Wynn, Jr.